UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CV-61035-RUIZ/STRAUSS

**CAYAGO AMERICAS, INC.,** *et al.*,

    Plaintiffs,
v.

**RENE HEINEN,** *et al.*,

    Defendants.
    _____/

## REPORT AND RECOMMENDATION ON CLAIM CONSTRUCTION

THIS MATTER came before the Court for claim construction of the patents forming the basis of the instant infringement action pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The matter was referred to me by the Honorable Rodolfo A. Ruiz II, pursuant to 28 U.S.C. § 636, for a ruling on all pre-trial, non-dispositive matters and a Report and Recommendation on dispositive matters. (DE 90). Pursuant to that referral, I held a *Markman* hearing on February 2, 2022. (DE 101). Prior to the *Markman* hearing, the parties submitted opening and reply claim construction briefing. (DE 81; DE 82; DE 84; DE 85). I have carefully reviewed the parties' briefing, argument presented during the *Markman* hearing, as well as the pertinent portions of the record.

    A. **Factual Background**

Cayago Tec GmbH and Cayago Americas, Inc. ("Plaintiffs") filed this action on May 17, 2021, against I-Aqua USA LLC, Luxury Water Toys, LLC and Rene Heinen (collectively "Defendants") alleging infringement of two U.S. Patents and the breach of a dealer agreement. The patents at issue, U.S. Patent No. 7,936,814 ("the '814 Patent") and U.S. Patent No. 9,744,019

("the '019 patent"), relate to a series of luxury water scooters called the SEABOB. The '814 Patent covers the water scooter's motor, and the '019 Patent covers the water scooter's rechargeable battery unit.

## B. Principles of Claim Construction

Claim construction is the process of "determining the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. The court looks to the following sources to show what a person of ordinary skill in the art would have understood the disputed claim language to mean: "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *See id.* at 1314. The claims, the specification, and the prosecution history (if it is in evidence) are generally considered to be intrinsic evidence. *See id.* at 1314-17.

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *See id.* at 1314; *see also Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed.Cir.1998) ("[T]he claims define the scope of the right to exclude; the claim

construction inquiry, therefore, begins and ends in all cases with the actual words of the claim."). The context in which a claim term is used and the other claims within the patent can provide insight into the meaning of a claim term. *See Phillips*, 415 F.3d at 1314. The claims also must be read in view of the specification, which is "the single best guide to the meaning of a disputed term." *See id.* at 1315. However, courts must ensure that they only use the specification to interpret the meaning of the claim and not import limitations from the specification into the claims. *See id.* at 1323; *see also Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001) ("[I]t is generally impermissible to limit claim terms by a preferred embodiment or inferences drawn from the description of a preferred embodiment."). "To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." *See Phillips*, 415 F.3d at 1323. Courts "should also consider the patent's prosecution history, if it is in evidence." *See id.* at 1317 (quoting *Markman*, 52 F.3d at 980). "The prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *See id.* "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *See id.* However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *See id.*

Although intrinsic evidence is important in claim construction, courts may also rely on extrinsic evidence. *See id.* Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."

*See id.* (quoting *Markman*, 52 F.3d at 980). This evidence "may be considered if the court deems it helpful in determining 'the true meaning of language used in the patent claims.'" *See id.* (quoting *Markman*, 52 F.3d at 980). However, extrinsic evidence is generally "less reliable than the patent and its prosecution history in determining how to read claim terms." *See id.* at 1318. If after applying all the above tools of claim construction, the claim is still ambiguous, then "the claims should be construed to preserve their validity." *See id.* at 1327. Thus, this maxim cannot be utilized if the claim terms at issue are not ambiguous. *See id.* at 1328.

Ultimately, "there is no magic formula or catechism for conducting claim construction." *See id.* at 1324. The court is also not "barred from considering any particular sources or required to analyze sources in any specific sequence." *See id.* at 1324. "[W]hat matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *See id.*

**C. Claims at Issue**

    **a. The Person of Ordinary Skill in the Art**

Because the parties must interpret the claims in the light of "a person of ordinary skill in the art," ("POSITA") they submit arguments on the qualifications of this POSITA. Plaintiff argues that a POSITA for the '814 Patent "would possess at least five years of experience in water scooter technology or an equivalent degree" and that a POSITA for the '019 Patent "would possess at least five years of experience in electrical engineering, development of electric watercraft or an equivalent degree." (DE 81 at 8). Defendants argue that a POSITA for both patents would have "at least one engineering degree or the equivalent experience." (DE 82 at 9). However, the parties fail to state the effect that these qualifications would have in the proceedings. For example, neither party presented evidence or argument that someone with an engineering degree would understand

any of the specific terms at issue differently than someone without an engineering degree but with experience developing electric watercraft. Indeed, even Defendants state that the parties' arguments are only "slightly different." (DE 84 at 4). Therefore, the Court accepts both parties' positions on the qualifications of a POSITA. *See Roland Corp. v. inMusic Brands, Inc.*, 17-CV-22405, 2019 WL 5291175, at *2 (S.D. Fla. Aug. 1, 2019) (accepting the qualifications advanced by the experts of both parties as those possessed by a POSITA).

### b. '814 Patent

There is one claim at issue in the '814 Patent, Claim 19. That claim reads as follows:

> A motor-driven watercraft, having a body on which a user at least partially rests or stands and having a **flow channel** extending through the body for containing a screw driven by an electric motor, wherein the electric motor, batteries, a control device for the electric motor and the screw are at least partially housed in the **flow channel**, the motor-driven watercraft comprising: the electric motor (3) having an internal rotor, a stator (21) in heat-conducting contact with a receiver housing (3.5) of the electric motor (3) by **a heat-conducting unit** (22), in an area adjacent the heat-conducting unit (22) the receiver housing (3.5) formed at least partially of **a material capable of conducting heat**, and the receiver housing (3.5) arranged at least partially in the **flow channel** (8).

(DE 81-2). The parties request that the court construe the following terms in this claim: "flow channel," "heat-conducting unit," and "a material capable of conducting heat."

#### i. "Flow channel"

Plaintiffs contend that this term should be construed as "a channel in which water may flow." Defendants contend that this term should be construed as "a single uninterrupted internal passageway starting at the bottom of the body near the front end and ending at the rear of the body."

The term "flow channel" appears two times in the '814 Patent's abstract, thirty times in the specification, and thirty times in the claims.[1] Thus, the definition of the term should be consistent throughout. The patent explains that the "flow channel" extends through the body of the watercraft and contains, at least partially, the electric motor, batteries, a control device for the motor, and the screw. '814 Patent col. 5, lines 65-67; col. 6, lines 1-4. Figure 1 of the patent reveals that the "flow channel," which is numbered eight, is towards the stern (or back)[2] of the watercraft and is located near to the outflow opening, which is numbered twelve. '814 Patent, page 3.



FIG. 1

The detailed description of the invention also notes that "[t]he flow channel 8 extends from the inflow opening 11 in the area of or near the bow as far as the outflow opening 12 in the area of or near the stern of the body 10 of the craft." '814 Patent col. 4, lines 7-9. This description of the flow channel is also found in claim 11 of the '814 Patent:

> 11. The motor-driven watercraft in accordance with claim 1, wherein the flow channel (8) begins with an inflow opening (11) near the bow of the body and terminates with an outflow opening (12) near a stern of the body (10).

'814 Patent col. 8, lines 55-57. Claim 11 is dependent on claim 1, which also contains the term "flow channel." *See* '814 Patent col. 8, line 54-55. The dependent nature of claim 11 is important

---

[1] It also appears twice in the specification of the '019 Patent. *See* '019 Patent col. 1, lines 23, 26.
[2] The front of the watercraft is referred to as the "bow."

because "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *See Phillips*, 415 F.3d at 1315.  In other words, the fact that claim 11 adds limitations to the "flow channel" (i.e. that it "begins with an inflow opening near the bow of the body and terminates with an outflow opening near the stern of the body") in the '814 Patent shows that the term itself is broader than the more limited description in claim 11.

Defendants contend their construction is proper because other portions of the '814 Patent (other than the claims) and the prior art cited in that patent application have similar depictions and descriptions of the flow channel.  While this is true, Defendants do not acknowledge that these descriptions are also present in dependent claims—of the '814 Patent and some of the patents cited as prior art.  *See* '814 Patent col. 8, lines 55-57; *see also* '372 Patent col. 4, lines 6-9 (stating in dependent claim 6 that the "flow channel (8) starts with an inflow opening (11) near a bow of the hull (10) of the craft and terminates in an outflow opening (12) near a stern of the hull (10) of the craft").  Thus, Defendants' construction is too narrow as it restricts the definition of "flow channel" in independent claim 1 of the '814 Patent by ascribing the limitations on that term added in claim 11.

However, accepting Plaintiffs' proposed definition is not ideal because it does not acknowledge that the "flow channel" is inside the watercraft.  This fact is made clear by the patent's numerous statements that the flow channel "extend[s] through the body" of the watercraft. *See* '814 Patent col. 5, lines 66-67; col. 7, lines 20-21; col. 8, lines 7-8; col. 8, lines 25-26.

Accordingly, I recommend that the Court adopt the following construction for "flow channel": "an internal passageway through which water may flow."

### ii. "Heat-conducting unit"

Plaintiffs contend that this term should be construed as "a unit capable of conducting heat." Defendants contend that this term should be construed as "a component distinct from and separate from a stator and a housing but cast with the stator and the housing."

"Heat-conducting unit" appears two times in the '814 Patent's abstract, four times in the specification, and three times in the claims. When the term appears, it is clear that the "heat conducting unit" facilitates the connection of the stator and the receiver housing. *See* '814 Patent page 1 (abstract); col. 2, lines 45-50; col. 5, lines 25-28; col. 7, lines 27-32; col. 7, lines 42-44. Thus, Defendants' construction has an advantage over Plaintiffs because it indicates that the heat conducting unit connects the stator and the housing. However, Defendants' inclusion of "cast" improperly imports limitations from the specification into the claims. *See Phillips*, 415 F.3d at 1323. Defendants presumably include the term "cast" because the detailed description of the invention indicates that: "[t]he stator 21 is cast together with the inner wall of the receiver housing 3.5 by a heat conducting unit 22 made of a casting compound." *See* '814 Patent col. 5, lines 26-28. Yet, nothing in the claims indicates that the stator and receiver housing must be "cast" together or that the "heat conducting unit" must be "cast" to either the stator or the receiver housing. *See* '814 Patent col. 7, lines 27-29 (stating that the stator is "in heat-conducting *contact* with a receiver housing (3.5) of the electric motor (3) *by* a heat-conducting unit (22)" (emphasis added)). In fact, the word "cast" is not used in the claims. As such, the Court should decline to utilize that term in its claim construction.

Additionally, unlike Plaintiffs' construction, Defendants' construction fails to highlight or even recognize that the unit or object must have the capability of conducting heat. This is important because this capability enables the claimed invention to achieve its purpose. *See* '814

Patent col. 2, lines 35-38 ("An electric motor thus designed can transfer its heat to the flowing water. Here, the heat conductivity provides a definite and rapid heat removal."). Other uses of "heat conducting" in the patent (before the words "contact" and "casting compound") confirm that ability to conduct or generate heat enables the claimed invention to function smoothly. *See* '814 Patent col. 1, lines 44 (stating that it is important that the housing which holds the batteries be in heat-conducting contact with the flowing water so that the heat can be "dependably transferred to the water"); col. 2, lines 46-50 (stating that "the heat conducting-unit is made of a heat-conducting casting compound" so that there is "[g]ood heat transfer between the stator and the receiver housing of the electric motor").

Accordingly, I recommend that the Court adopt the following construction for "heat conducting unit": "a component that connects the stator to the housing and which is able to conduct heat."

### iii. "A material capable of conducting heat"

Plaintiffs contend that this term should be construed as "a material capable of conducting heat." Defendants contend that this term should be construed as "a metal."

This term appears twice in the patent's specification and twice in the claims. When used, the term describes the material the housing is made—or consists—of. '814 Patent col. 1, line 43 ("the housing at least partially is of a material capable of conducting heat"); col. 2, lines 33-34 ("the receiver housing includes at least in part a material capable of conducting heat"); col. 6, lines 9-10 ("the housing (9) formed at least partially of a material capable of conducting heat"); col 8, lines 16-17 ("the housing (9) formed at least partially of a material capable of conducting heat"). That the housing is made of "a material capable of conducting heat" is important because the patent describes the housing as being in "heat-conducting contact with the flowing water." '814 Patent

9

col. 1, lines 44-45; col. 8 lines 18-19; *see* col. 6, lines 12-13.  Ultimately, as Plaintiffs suggest, the term "material capable of conducting heat" contains commonly understood words and has a widely accepted meaning.

Defendants' arguments regarding "material capable of conducting heat" are similar to their arguments for "heat-conducting unit."  They argue that "material capable of conducting heat" should be defined as a "metal" to answer the patent examiner's observation that all materials have the capability of conducting heat to some degree (one reason listed as a basis for the previous rejection of the claims).  DX-17 at 325, 556, 593.  Defendants chose the construction "metal" because one of the patents relied upon by the inventor in his application utilized a die-cast zinc alloy metal as its heat conducting unit.  DX-5 at 2 ("[D]uring the die casting process, in the present case a zinc was used as the heat-conducting material 28. Die cast alloy used.").  However, although metals conduct heat, and do so relatively well, the term "metal" is not used in the '814 Patent, and there is nothing in the '814 Patent stating or indicating that the "material capable of conducting heat" must necessarily be a metal.  *See* '814 Patent col, 2, lines 35-40.  *Cf.* DX-5 at 2 ("[T]he material 28 embedding the winding heads 26 must have both a good thermal conductivity, a low shrinkage behavior and a melting point which is significantly below copper.").  The '814 Patent also does not state that the material needs to be capable of conducting heat "well," just that it be "capable."  Moreover, while the patent examiner did observe that all materials have the capability of conducting heat to some degree, nothing in the prosecution history indicates any amendment, limitation, or other change to address this observation before patent approval.  Therefore, it is difficult to infer any limitation to the widely accepted meaning of the words from this observation.

Notably, for "material capable of conducting heat" and "heat conducting unit," Defendants argue that their constructions are necessary to sustain the validity of the patent.  They note that in

the prosecution history, the claims were rejected based on the prior art and argue that the current patent provides no guidance on how (if at all) the terms differ from their use in the prior art. Thus, Defendants argue, absent their proposed constructions, the claim at issue (claim 1 of the '814 Patent) is insufficiently distinguishable from prior art and therefore invalid. However, patents should only be construed to preserve validity if the terms are ambiguous after utilizing all the tools of claim construction (which include evaluating the intrinsic and extrinsic evidence). *See Phillips*, 415 F.3d at 1327-28. As Defendants have not sufficiently shown that the term at issue is ambiguous, the Court should decline to resort to this maxim of construction.[3] Defendants contend that Plaintiffs proposed construction is basic and unhelpful. However, I find that in this instance, the ordinary meaning of the claim language (to a POSITA) is "readily apparent" and "involves little more than the application of the widely accepted meaning of commonly understood words." *See id.* at 1314.

Therefore, I recommend that the Court adopt Plaintiffs' proposed construction.

### c.   '019 Patent

There is also one claim at issue in the '019 Patent, Claim 1. That claim reads as follows:

A rechargeable battery unit for a watercraft, the rechargeable battery unit comprising: a **holding arrangement** including two **holders**, each **holder** having a plurality of **receptacles**; a plurality of rechargeable batteries connected to one another by the **holding arrangement** to form a rechargeable battery cell, each of the rechargeable batteries having two poles; at least one pole connector electrically coupling at least some of the rechargeable batteries to one another; wherein two or more rechargeable battery cells are lined up with one another and electrically connected to one another; and wherein the two **holders** of the **holding arrangement** of each rechargeable battery cell are separated by a clearance distance, each holder receiving a respective one of the two poles of each rechargeable battery.

---

[3] To be clear, I express no opinion on whether Defendants are correct that claim 1 of the '814 Patent is invalid if construed as Plaintiffs propose.

11

(DE 81-1). The parties request that the Court construe the following terms in this claim: "holding arrangement," "holder," and "receptacle."

### i. "Holder"

The parties agree that a "holder" is "an object that has a plurality of receptacles." Thus, I recommend that the Court adopt this agreed-upon construction.

### ii. "Receptacle"

Plaintiffs contend that this term should be construed as "an object capable of holding something." In their *Markman* briefing, Defendants contended that this term should be construed as "a component that has a plurality of apertures, each aperture having inner walls to match the outer contour of the batteries so that the battery pole ends can be inserted into and retained in the apertures." However, in their Proposed Findings of Fact and Conclusions of Law regarding Plaintiffs' pending Motion for Preliminary Injunction, Defendants now contend that the term should be construed as "a device having a recess into which the ends (poles) of the batteries are held in place." (DE 128 at 13).[4]

Defendants' constructions are based primarily upon Figure 1 in the '019 Patent.

---

[4] In their Proposed Findings of Fact and Conclusions of Law, Defendants contended that the construction they proposed in their *Markman* briefing was too narrow considering the testimony provided at the preliminary injunction hearing. (DE 128 at 13). To the extent that Defendants have not abandoned this construction, the Court also finds that it is too narrow. In addition to issues with the proposed construction's reference to inserting the pole ends, discussed *infra*, I find that the limitation of "each aperture having inner walls to match the outer contour of the batteries" is not supported by the intrinsic evidence.



Fig. 1

The written description of this figure states the following:

> The receptacles 21.1, 22.1 are designed as apertures, wherein the inner walls of the apertures are formed so as to match the outer contour of the rechargeable batteries 10. Therefore, the rechargeable batteries 10 can be inserted into the receptacles 21.1, 22.1 by way of their pole-side ends.

While Defendants' construction comports with the description of this figure, it is improper to import limitations from the written descriptions or the drawings. *See Phillips*, 415 F.3d at 1323.

"Receptacle" is found numerous times throughout the patent (once in the abstract, twenty times in the specification, and four times in the claims). The term is also utilized on its own and in several phrases: "plug receptacle," "receptacle structure," "lateral contact receptacles," "threaded receptacle," and "contact receptacles." The phrase "plug receptacle" is present in the claims. '019 Patent col. 7, lines 14-15. Specifically, claim 3 states that: "the receptacles include plug receptacles, each plug receptacle receiving a respective end of the cylindrical housing of one of the rechargeable batteries." This is important because claim 3 is dependent on claim 1, which states that there are "a plurality of receptacles" in each holder. '019 Patent col. 6, lines 57-58. The use of the phrase "plug receptacle" in claim 3 indicates that the "receptacles" in claim 1 were not

13

meant to be limited in such a manner. *See Phillips*, 415 F.3d at 1315. This interpretation is consistent with the fact that there are other receptacles described in the patent that do not receive battery pole ends. *See e.g.* '019 Patent col. 6, lines 3-5 ("The holding piece 79 forms a threaded receptacle 79 in the center, the tensioning element 60 being screwed into said threaded receptacle").

The amendments to claim 1 in the prosecution history are also instructive. *See* DX-22 at 22, 34, 480. After an initial rejection by the patent examiner, the patent applicant added to claim 1 that the holders, "by way of their receptacles," would receive the opposite poles of the batteries. *See* DX-22 at 22. However, after a subsequent rejection, the applicant removed the phrase "by way of their receptacles" from claim 1. *Compare* DX-22 at 480 *with* '019 Patent col. 7, lines 1-5. This deletion suggests that receptacles do not need to receive the pole end of the battery. Accordingly, Defendants construction is too narrow.

Plaintiffs' construction is also deficient because it fails to account for the idea that the receptacles must "receive" something or have something "inserted" into them. *See* '019 Patent col 2., lines 13-16 (stating that the receptacles enable the holders to "receive the opposite poles of the individual rechargeable batteries"); col. 4, lines 5-7 (stating that "the rechargeable batteries can be inserted into the receptacles"); col. 4 lines 12-13 (the accumulators . . . are inserted into the receptacles"); col. 6, lines 4-5 (stating that the tensioning element is "screwed into" the threaded receptacle); col 7, lines 15-17 (stating that "plug receptacle[s] receiv[e] a respective end of the cylindrical housing of one of the rechargeable batteries").

Accordingly, I propose the following construction for the term: "a component into which another object is inserted."

### iii. "Holding Arrangement"

Plaintiffs contend that this term should be construed as "a configuration of holders." Defendants contend that this term should be construed as "two spaced apart holders but excluding holders that engage the circumference of the battery units intermediate their ends."

Defendants' construction acknowledges that a "holding arrangement" consists of two holders that are separated or spaced apart. This interpretation is supported by the following portion of claim 1:

> wherein the two holders of the holding arrangement of each rechargeable battery cell are separated by a clearance distance, each holder receiving a respective one of the two poles of each rechargeable battery.

'019 Patent col. 7, lines 1-4. Indeed, as Plaintiff acknowledged at the *Markman* hearing, it was this concept of spacing or clearance distance that distinguished this patent from the Yamagami Patent. *See* (DE 82-22 at 485-86; DE 112 at 43-44). Therefore, the definition of "holding arrangement" should incorporate the concept of spacing or separation.

The remaining portion of Defendants' construction ("but excluding holders that engage the circumference of the battery units intermediate their ends") results from a comparison to prior art. This prior art is European Patent Application ("EP") 2343752A2, which is cited in the patent. '019 Patent, page 2. Specifically, Defendants refer to Figure 44 in EP 2343752A2.



DX-19 at 86.

Looking at Figure 44, Defendants assert that the "holding arrangement" in the '019 Patent should exclude holders (like 304 in Figure 44) that "engage the circumference of the battery units intermediate the ends" to distinguish it from EP 2343752A2. However, Defendants fail to convincingly explain why "holding arrangement" must be construed to distinguish it from EP 2343752A2. Defendants point to no portion of the prosecution history suggesting that the patent examiner raised concerns that the holding arrangement in the '019 Patent was anticipated by EP EP 2343752A2. The '019 Patent was approved despite the citing of EP 2343752A2, and it should be presumed valid. More importantly, it is improper to import limitations from the drawings (and certainly not drawings that are not in the patent at issue) into the claims. *See Phillips*, 415 F.3d at 1323. These limitations are also not supported by the words of the claims or the specification. To the extent that Defendants are proposing this construction to preserve the validity of the patent, it

is improper to do so in this instance, as the term "holding arrangement" is not ambiguous. *See Phillips*, 415 F.3d at 1327-28. Therefore, the Court should not adopt Defendants' construction in full.

It would similarly be improper to adopt Plaintiffs' construction as it is overly broad and not helpful. For example, it does not provide any insight into how the two holders are "configured."

Accordingly, I recommend that the Court adopt the following construction for the term: "a configuration of two spaced-apart holders."

## CONCLUSION

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge. Failure to timely file objections shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida, this 29th day of April 2022.

*Jared Strauss*
Jared M. Strauss
United States Magistrate Judge