## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-CV-61035-RUIZ/STRAUSS

**CAYAGO AMERICAS, INC.**, *et al.*,

     Plaintiffs,

v.

**RENE HEINEN**, *et al.*,

     Defendants.

_____/

### REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

THIS CAUSE comes before me upon Cayago Tec, GmbH and Cayago Americas, Inc.'s ("Plaintiffs'") Motion for Preliminary Injunction ("Motion").  (DE 45).  The District Court has referred the case to me for rulings on all pre-trial, non-dispositive matters and for issuance of a Report and Recommendation on any dispositive matters.  (DE 90).  I have reviewed the Motion, the response ("Response") (DE 63), the reply ("Reply") (DE 66), the sur-reply (DE 70) and the record in this case.  In addition, I held a three-day evidentiary hearing ("Evidentiary Hearing") on the Motion. (DE 99; DE 100; DE 102).  At the Evidentiary Hearing, I took testimony and reviewed evidence pertaining to this matter.  Furthermore, I reviewed the parties' post-hearing briefs (DE 126; DE 127; DE 128; DE 129) with respect to the Evidentiary Hearing.  Being otherwise duly advised, I respectfully **RECOMMEND** that the Motion (DE 45) be **DENIED** for the reasons stated herein.

### FACTUAL BACKGROUND

On May 17, 2021, Plaintiffs filed a three-count Initial Complaint ("Initial Complaint") against Rene Heinen (one of its former employees), Luxury Water Toys, LLC ("LWT") (one of

Plaintiffs' former dealers), and I-Aqua USA LLC (the company which Heinen now owns).  (DE 1).  Plaintiffs contend that I-Aqua USA's products (the SeaDart Ace watercraft) infringe two patents Plaintiffs own: United States Patent Number 9,774,019 ("the '019 Patent") and United States Patent Number 7,963,814 ("the '814 Patent").  Plaintiffs also contend that LWT breached the Dealer Agreement between LWT and Cayago Americas by, among other things, selling or offering to sell the SeaDart Ace.  On July 2, 2021, Plaintiffs filed an Amended Complaint ("Amended Complaint").  (DE 18).  On August 8, 2021, Plaintiffs filed their Second Amended Complaint.  (DE 41).  Plaintiffs' Second Amended Complaint alleges the following counts against all Defendants:

Count I – Infringement of the '019 Patent

Count II – Infringement of the '814 Patent

Count III – Breach of the Dealer Agreement

*Id.* On September 29, 2021, Heinen, LWT, and I-Aqua USA filed their Answer, Affirmative Defenses, and Counterclaims.  (DE 44).  On October 4, 2021, Plaintiffs filed the instant Motion. (DE 45).  After I was referred the Motion, I held a three-day evidentiary hearing from January 31, 2022 to February 2, 2022.  (DE 69; DE 99; DE 100; DE 102).  I also held a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) on February 2, 2022.  (DE 101).

**FINDINGS OF FACT**

1. Plaintiff Cayago Tec GmbH owns the '814 and '019 patents.  (DE 109 at 38-40).

2. The '814 patent covers an "electric motor-driven watercraft, which is cooled by the surrounding water."  (DE 109 at 51-52; DE 114-1).

3. The '019 patent covers a rechargeable battery unit for a watercraft.  (DE 109 at 74-75; DE 114-2).

4. Plaintiffs' products, the SEABOB watercraft series, are covered by the patents at issue. (DE 45-2; DE 110 at 93).

5. Plaintiff Cayago Americas has exclusive authority to distribute, sell, and offer to sell the patented products in the United States.  (DE 109 at 40; DE 110 at 93).

6. SEABOB watercraft are a combination of a surface water scooter and an underwater scooter.  (DE 109 at 36).  SEABOBs enable riders to travel both above and below the water at high speeds for long periods of time.  *Id.*

7. The SEABOB is marketed to owners of (or those who charter) luxury yachts, scuba divers, resorts, and high-end customers.  (DE 110 at 98-99; DE 114-6; DE 114-7).  As a result, the SEABOB has developed a great reputation and brand recognition.  (DE 110 at 98-100).

8. Plaintiffs have invested a significant amount (over $1 million) in developing and marketing the SEABOB in the United States. (DE 45-2; DE 110 at 100-01).

9. Defendants I-Aqua USA and LWT are both Florida Limited Liability Companies.  (DE 41 at 2).

10. Defendant Heinen is a resident of Florida and a member of both I-Aqua USA and LWT. *Id.*; (DE 109 at 158).

11. Plaintiffs allege that Defendants infringe claim 19 of the '814 patent and claim 1 of the '019 patent due to their use, importation for sale, offer for sale, or sale of the SeaDart Ace watercraft.  *Id.* at 49, 73-74.

12. The SeaDart Ace watercraft is manufactured by I-Aqua (Hong Kong) Limited, a Chinese company ("I-Aqua HK").  *Id.* at 23-24.

13. I-Aqua HK manufactured other products that were the subject of another infringement lawsuit filed by Plaintiffs in 2019.  *Id.* at 22.  In that lawsuit, Plaintiffs alleged that I-Aqua

HK's other products infringed two patents, one of which was the '019 Patent. *Id.* at 22-24. The 2019 lawsuit settled, and the parties involved agreed not to use, sell, offer for sale, or import any devices that infringed Plaintiffs' patents. *Id.* at 22. One of the parties involved was Charles Fultz, a former U.S. distributor of I-Aqua HK's products. *Id.* at 20-23.

14. Cayago Americas and LWT are parties to a Dealer Agreement. (DE 49-1; DE 109 at 166-67). Under this agreement, LWT rents and sells SEABOBs. (DE 109 at 177, 197; DE 110 at 23, 32).

15. LWT became a Cayago dealer in 2017. (DE 109 at 166). Heinen did not disclose his interest in LWT to Cayago. *Id.* at 202-03. Heinen's stepson, Radimus Rodriguez, signed the first Dealer Agreement for LWT. (DE 110 at 84-85). Heinen signed the most recent Dealer Agreement for LWT. (DE 49-1).

16. This Dealer Agreement was renewed each year from 2018 to 2021. (DE 109 at 168). Heinen last renewed the Agreement on behalf of LWT on January 4, 2021. (DE 49-1).

17. The Dealer Agreement includes, *inter alia*, a non-compete provision (section 2.6), a term and termination provision (section 9), a confidentiality section (section 10), a notice provision (section 13.4), an entire agreement/parole evidence provision (section 13.5), and a severability provision (section 13.6). *Id.* These sections read as follows:

18. § 2.6 Competition:

During the term of this Agreement, Dealer shall not, directly or indirectly; (a) import, market, manufacture, use, promote, sell, distribute or purchase any product that directly competes with the Product, (a "Competing Product"); or (b) engage in, provide services for or acquire or hold an interest in any company, entity or business (as owner, stockholder, partner, co-venturer, director, officer, employee, consultant or otherwise) that imports, manufactures, markets, promotes, sells or distributes a Competing Product; without the express written consent of the Company, which consent shall not be unreasonably withheld.

*Id.* at 2.

19. § 9 Term and Termination (relevant provisions):

9.1. Term of Agreement. The term of this Agreement shall commence on the Effective Date and, unless earlier terminated in accordance with the provisions of this Agreement, continue until December 31 of the calendar year in which the Effective Date occurs (the "Initial Term"). After such Initial Term, this Agreement shall automatically renew for additional periods of twelve (12) months each, with each such additional period of twelve (12) months to commence on January 1 and end on December 31 (each such period a "Subsequent Term") (the Initial Term and any Subsequent Term each a "Term") unless the Company has provided, at least ninety (90) days prior to such renewal, written notice to the Dealer of its intention to not renew.

9.2. Termination for Breach. Either party may terminate this Agreement in the event the other party has breached any material term or condition of the Agreement and such breach remains uncured for thirty (30) days (or ten (10) days in the case of non-payment) following receipt of written notice from the non-breaching party specifying the breach.

9.3. Termination upon Insolvency. This Agreement may be terminated by either party immediately and without notice in the event the other (i) admits in writing its inability to pay its debts generally as they become due, (ii) makes a general assignment for the benefit of creditors, (iii) institutes proceedings to be adjudicated a voluntary bankrupt, or consents to the filing of a petition of bankruptcy against it, (iv) is adjudicated by a court of competent jurisdiction as being bankrupt or insolvent, (v) seeks reorganization under any bankruptcy act, or consents to the filing of a petition seeking such reorganization, or (vi) ceases to do business itself or through a successor.

9.4. Termination by Company. Company may terminate this Agreement for any reason upon ninety (90) day prior written notice. Company may also terminate under Section 7.4 by providing thirty (30) days written notice. Pursuant to Section 4.7, in the event Dealer fails to meet the minimum purchase commitment in any Term, within the first sixty (60) days of the start of the start of the Subsequent Term following the Term in which the Dealer failed to meet the minimum purchase commitment, Company shall have the right to terminate this Agreement upon fourteen (14) days prior written notice to the Dealer.

*Id.* at 8.

20. § 10 Confidentiality:

10.1. Confidential Information. "Confidential Information" means any information (including, but not limited to, customer and price lists, marketing and distribution plans and activities), report, document or other materials (including, but not limited

to, schematics, specifications, diagrams, specimens, samples, and data) disclosed or provided to the other party during the term of this Agreement which is of a trade secret, confidential, proprietary or like undisclosed nature or which is identified as such. Company's Confidential Information includes the pricing for the Products.

10.2. Non-disclosure. All Confidential Information shall be retained by the receiving party in confidence for the term of this Agreement and indefinitely thereafter and shall not be used except in connection with performance under this Agreement. The receiving party shall not disclose or otherwise make available any of the Confidential Information to anyone, including employees and agents, except those employees or agents of the receiving party who need to know the Confidential Information for the receiving party to perform its obligations under this Agreement. The receiving party shall (i) instruct any such employees and agents not to disclose or otherwise make available any of the Confidential Information to anyone, and (ii) be liable to the disclosing party for any action or inaction of such employees or agents, and former employees and agents, that would violate this Agreement, had the action or inaction been that of the receiving party directly. The receiving party shall exercise the same care and safeguards with respect to Confidential Information disclosed by the disclosing party as used to maintain the confidentiality of its own information of like character, but in any event a reasonable degree of care.

10.3. Exceptions. Nothing in this Agreement shall in any way restrict the right of a receiving party to use, disclose, or otherwise deal with any information that (i) was already known to the receiving party at the time of disclosure as evidenced by written documents in the receiving party's possession prior to disclosure, (ii) was generally available to the public or becomes publicly known through no wrongful act of the receiving party, (iii) was received by the receiving party from a third party who had a legal right to provide it, or (iv) was developed independently of knowledge of Confidential Information received by the receiving party from the disclosing party. In addition, a receiving party shall be permitted to disclose Confidential Information if required pursuant to the request of any governmental agency or any court of competent jurisdiction, provided that the receiving party shall limit disclosure to only that specific information required, shall use its reasonable efforts to obtain confidential treatment with respect to any such information disclosed, and shall notify the other party before providing such information in order to enable that party to seek a protective order.

*Id.* at 9.

21. § 13.4 Notices

Any notice required or permitted to be given to a party hereunder shall be given in writing by personal delivery, by reputable overnight courier with established tracking capability (such as Federal Express), or by email with confirmation of

receipt. Such notices shall be sent to the addresses set forth above or to such other address as a party may designate by written notice.

*Id.* at 10.

22. § 13.5 Entire Agreement

This Agreement, including all exhibits hereto, and Company's standard terms and conditions of sale constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous communications and agreements. In the event of a conflict between this Agreement and Company's standard terms and conditions of sale, the provisions of this Agreement shall control. This Agreement may not be modified except by a written agreement dated subsequent to the Effective Date and signed on behalf of the parties by their respective duly authorized representatives.

*Id.*

23. §13.6 Severability:

If any provision of this Agreement is held to be invalid, void or unenforceable, such provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the parties in accordance with applicable law, and the remaining provisions of this Agreement shall remain in full force and effect.

*Id.*

24. Heinen was employed by Cayago Americas as a sales manager from January 2017 to May 2018.  (DE 109 at 164).  His primary responsibility was to acquire new dealers to sell SEABOB watercraft.  *Id.*

25. In March 2021, Heinen visited Cayago Americas to inform them that LWT wished to terminate the Dealer Agreement.  (DE 110 at 73).  Heinen informed Cayago Americas' CEO, Claus Gruner, that there was too much competition among the dealers and the supplier and it no longer made sense for LWT to sell SEABOB watercraft.  *Id.*  Gruner rejected this termination.  *Id.*

26. On July 9, 2021, Heinen sent Cayago Americas written notice that LWT was terminating the Dealer Agreement "effective immediately."  (DE 108-6).

27. Cayago Americas also rejected this attempt to terminate, informing Heinen in writing that "[t]he Agreement does not contain a provision allowing the dealer to so terminate" and that the Agreement would remain "in full force and effect."  (DE 108-7).

28. Heinen has another company, Luxury Water Rentals ("LWR"), that functions as a beach rental business.  (DE 110 at 22, 30-31). LWR owns several SEABOB watercraft.  *Id.* at 22-23.

29. In early 2020, Heinen obtained a SeaDart Ace from Charles Fultz.  (DE 109 at 27; DE 110 at 13).

30. Heinen and some of his LWR staff used this SeaDart Ace to test it.  (DE 110 at 14-17, 37).

31. According to Heinen, the SeaDart Ace he obtained from Fultz is now in his storage facility and was not used by or sold to any customers.  *Id.* at 13, 52.  He claims that I-Aqua HK owns this SeaDart Ace.  *Id.* at 14.

32. In late December 2020 and early January 2021, Michael DeMas attempted to purchase a SeaDart Ace from Heinen.  *Id.* at 152.   Heinen informed DeMas that he could not sell him a SeaDart directly because he had not yet set up a distributorship with I-Aqua HK.  *Id.* However, Heinen offered to facilitate the purchase for DeMas and even provided DeMas a quote on I-Aqua USA letterhead.  *Id.* at 153; (DE 114-26).  At the hearing, Gruner revealed that DeMas was a friend of his who was helping him to obtain a SeaDart Ace for Plaintiffs to inspect.  (DE 110 at 149-50).

33. Gruner stated that he saw a SeaDart Ace watercraft displayed on Fort Lauderdale Beach on two separate occasions in July 2021.  *Id.* at 115-16.  This SeaDart Ace watercraft was placed next to SEABOB watercraft.  *Id.* at 115.

34. The suggested retail price for the SEABOB starts at $9,415.00, compared to the suggested retail price of about $7,000.00 for the SeaDart Ace.  *Id.* at 65, 76.

35. Gruner has encountered customers at trade shows who asked for a discount on the SEABOB because they saw a water scooter like the SEABOB that was sold at a lower price.  *Id.* at 119-20.

36. I-Aqua USA has sold twelve SeaDart Ace watercraft, and two are on pre-order.  *Id.* at 65.

37. I-Aqua USA is expecting to receive seventy-two (72) SeaDart Ace watercraft in the next few months.  *Id.* at 80, 85-86.

38. I-Aqua HK also has a distributor in Puerto Rico that recently received a shipment of SeaDart Ace watercraft.  *Id.* at 120.  The month after this shipment, one of Plaintiffs' dealers in Puerto Rico experienced a drop in sales.  *Id.*

39. Heinen became aware of the previous lawsuit regarding I-Aqua HK's products at the end of 2020 and the beginning of 2021.  *Id.* at 63.

40. Heinen stated that I-Aqua HK told him the SeaDart Ace model he would be selling did not infringe Plaintiffs' patents.  *Id.* at 55-57.

41. One dispute between the parties concerns the SeaDart Ace's battery design.  Danish Syed Mohammed, the corporate representative and managing director for I-Aqua HK, admitted that the SeaDart Ace's original battery design infringes the '019 Patent.  *Id.* at 161, 227; (DE 114-21).  With the help of DeMas, their "secret shopper," Plaintiffs received a SeaDart Ace with this battery design directly from I-Aqua HK as late as November 2020.  (DE 109 at 82; DE 110 at 149-50). Heinen also received a SeaDart Ace with this battery design from Fultz.  (DE 110 at 12-13, 54). However, I-Aqua HK changed the design of the SeaDart Ace's battery to a new design.  (DE 108-15; DE 110 at 179-80).  According to Mohammed,

I-Aqua HK stopped producing SeaDart Ace watercraft with this old battery design in late 2020.  (DE 110 at 184-85).

42. The holders in the new SeaDart Ace battery unit surround the battery cylinder.  (DE 110 at 190; DE 108-13; 108-15).  There is also no gap or space between the two holders.  (DE 110 at 179-81, 191-92; DE 108-13; DE 108-15).

43. According to Mohammed and Defendants, the SeaDart Ace watercraft sold to I-Aqua USA all have the new battery design.  (DE 110 at 179-80).  Mohammed stated that I-Aqua HK ensured that only the new forms of the battery were being shipped to the United States.  *Id.* at 184.

44. Defendants submitted parts of this battery design into evidence.  (DE 108-13; DE 108-14; DE 108-15; DE 108-16).

45. Defendants brought a SeaDart Ace to the evidentiary hearing.  (DE 109 at 41-42).  They contended that this watercraft had the new battery design.  (DE 110 at 178-79).  However, neither of the parties opened the watercraft to confirm which battery design it contained.  (DE 111 at 49-50).

46. The other disputes surrounding the SeaDart Ace watercraft concern the '814 Patent.  The first is the location of the watercraft's "flow channel" and whether certain parts inside of the watercraft are in that "flow channel." (DE 109 at 15, 24, 59).

47. Pascal Wizenti, Cayago Tec's CEO and a member of the development team of the current model of Plaintiffs' SEABOB watercraft, testified that the "flow channel" comprised the entire area inside the body (upper and lower shell) of the watercraft.  *Id.* at 35, 56-57, 60.  Wizenti stated that the '814 Patent contemplated that the flow channel could be the entire body of the watercraft.  *Id.* at 60.

48. The next dispute surrounding the '814 Patent concerns the motor of the watercraft. *Id.* at 51, 68. A motor has three essential components: the stator, the rotor, and the motor housing. (DE 111 at 5). The rotor rotates, the stator is fixed to the motor housing, and the housing houses the rotor and the stator. *Id.* at 5-6.

49. The stator of the SeaDart Ace consists of the copper wires surrounded by a dark grey metal sheet. (DE 109 at 103, 105; DE 114-20). That metal sheet continues radially outward from the copper winding towards the housing. (DE 109 at 103). Wizenti identified the part of the metal sheet continuing out from the copper windings to the housing as the SeaDart Ace's "heat conducting unit." (DE 109 at 71, 103).

50. The SeaDart Ace's housing is the light grey metal that forms a ring or a "doughnut" around the stator and heat conducting unit. (DE 109 at 103; DE 114-20).

51. Mohammed testified that the SeaDart Ace's motor has a small air gap between the housing and the stator. (DE 110 at 176). To ensure that the stator is fixed to housing, that gap is filled with epoxy resin (a bonding agent). *Id.* Mohammed testified that the epoxy used by I-Aqua HK is an insulator, which is the opposite of a heat conductor. *Id.* at 177. According to Mohammed, there is no metal between the SeaDart Ace's stator and housing. *Id.* at 176.

52. Plaintiffs recorded a video of a computed tomography ("CT") scan of the SeaDart Ace's motor. (DE 110 at 209-14; DE 114-24; DE 114-25; DE 125). Mohammed was not able to identify epoxy in the video. *Id.* at 210. Mohammed stated that the CT scan likely did not detect the epoxy; only the copper winding and the receiver housing were visible in the video. *Id.* at 211-14.

## ANALYSIS

### I.    Legal Standard

"The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Attorney Gen.*, 957 F.3d 1171, 1178 (11th Cir. 2020) (quoting *Northeastern Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990)); *see also Brown v. Sec'y, U.S. Dep't of Health & Human Servs.*, 4 F.4th 1220, 1225 (11th Cir. 2021) (same).

As the Supreme Court has instructed:

> Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing[,] and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (internal citations omitted).

"Upon application for injunctive relief, [Federal Rule of Civil Procedure 52] requires a district court to hear the evidence in support of and opposition to the injunction and, whether the court grants or denies the application, issue an order stating its findings of fact and conclusions of law." *Georgia Advocacy Office v. Jackson*, 4 F.4th 1200, 1208 (11th Cir. 2021) (citing Fed. R. Civ. Pro. 52(a)). "If the court grants the injunction, it must state the reasons why it issued, state the terms of the injunction specifically, and describe in 'reasonable detail . . . the act or acts restrained or required.'" *Id.* (quoting Fed. R. Civ. Pro. 65(d)).

To obtain a preliminary injunction in the Eleventh Circuit, a movant must establish: (1) a substantial likelihood of success on the merits of its claim at trial; (2) a substantial threat of irreparable harm to the movant if injunctive relief is denied; (3) that the injury to the movant

outweighs the potential harm that an injunction may cause the defendant; and (4) an injunction will not disserve the public interest. *See Superior Consulting Servs., Inc. v. Shaklee Corp.*, 710 Fed. Appx. 850, 853 (11th Cir. 2017). The Federal Circuit's standard is the same, except that it does not require a plaintiff to prove their likelihood of success is "substantial"; a plaintiff need only prove that success is "more likely than not." *See Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, 431 Fed. Appx. 884, 886 (Fed. Cir. 2011). The Eleventh Circuit and the Federal Circuit have both acknowledged that "[a] preliminary injunction is an 'extraordinary and drastic remedy' and should not be granted unless the movant clearly satisfies its burden of persuasion as to [these] four prerequisites." *Superior Consulting Servs.*, 710 Fed. Appx. at 853 (citations omitted); *see Takeda Pharm. U.S.A., Inc. v. Mylan Pharm. Inc.*, 967 F.3d 1339, 1345 (Fed. Cir. 2020); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). Thus, the motion should be denied if the plaintiff fails to meet its burden as to one of the elements. *Superior Consulting Servs.*, 710 Fed. Appx. at 859-60; *Takeda Pharm. U.S.A., Inc.*, 967 F.3d at 1350.

## II.     Conclusions of Law

### a.   Likelihood of Success on the Merits

#### i.   Patent Infringement

"Substantive matters of patent infringement are unique to patent law, and thus the estimated likelihood of success in establishing infringement is governed by Federal Circuit law." *Revision Military, Inc.*, 700 F.3d at 526. Accordingly, Plaintiffs must meet the Federal Circuit's "more likely than not" standard and not the Eleventh Circuit's "substantial likelihood" standard on the patent-related issues. *See id.*; *see also Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014) (same). "To establish a case of patent infringement, a plaintiff must prove

two elements: (1) that it owns a duly issued patent and (2) that the defendant has infringed its patent." *A.W. Indus. Inc. v. Elec. Connector Serv. Inc.*, 97-6452-CV-MIDDLEBROOKS, 1997 WL 873869, at *6 (S.D. Fla. Dec. 9, 1997). "Determining whether a patent is infringed involves a two-step inquiry: (1) interpreting the claims, followed by (2) comparing the properly interpreted claims to the accused device." *Id.* at *7; *see also Edge Sys. LLC v. Aguila*, 635 Fed. Appx. 897, 902 (Fed. Cir. 2015) (same). "To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims." *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998). "If even one limitation is missing or not met as claimed, there is no literal infringement." *Id.*[1]

"For a patentee to establish that it is likely to succeed on the merits, it 'must demonstrate that it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer.'" *Kimberly-Clark Worldwide, Inc.*, 431 Fed. Appx. at 886 (quoting *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010)). If an alleged infringer "raises a 'substantial question' concerning validity, enforceability, or infringement (*i.e.*, asserts a defense that [the plaintiff] cannot show 'lacks substantial merit') the preliminary

---

[1] When comparing the construed claims to an allegedly infringing device, infringement may be found either literally or under the doctrine of equivalents. *See Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003); *see also Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1362 (Fed. Cir. 2019) (stating that "a product or process that does not literally infringe a patent claim may nevertheless be held to infringe" under the doctrine of equivalents). To prove infringement under the doctrine of equivalents, the patentee must show that the differences between an element in the accused product and the claim limitation are "insubstantial" to one of ordinary skill in the art. *See Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002). However, Plaintiffs have presented no evidence or argument to support applying this theory in this case. Therefore, I only evaluate Plaintiffs' claims for literal infringement. *See Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996).

injunction should not issue." *See Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997).

### 1. Defendants' Liability for Infringement

Before considering whether Plaintiffs have shown that the SeaDart Ace infringes either of their patents, the Court must determine whether the Defendants could be found liable for such infringement. Those who "make[], use[], offer[] to sell[], or sell[]" or "import[]" a patented invention without authority may be liable for direct infringement. 35 U.S.C. § 271(a). Direct infringement is distinct from inducement and contributory infringement, which are theories of third-party liability. *See Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1315 (Fed. Cir. 2010); *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986); *Van Well Nursery, Inc. v. Mony Life Ins.*, 362 F. Supp. 2d 1223, 1227 (E.D. Wash. 2005). Those who "actively induce infringement of a patent" may be liable as an infringer under a theory of inducement. 35 U.S.C. § 271(b). Lastly, the theory of contributory infringement applies to those who:

> offer[] to sell or sell[] within the United States or import[] into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use[.]

35 U.S.C. § 271(c). The theories of third-party liability depend on a finding of direct infringement by some party. *See Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986) ("Absent direct infringement of the patent claims, there can be neither contributory infringement . . . nor inducement of infringement.").

Defendants argue that this Court should evaluate their liability for infringement separately. I-Aqua USA is the primary corporate Defendant in this case who has both sold and offered to sell

the allegedly infringing products manufactured by I-Aqua HK.  Thus, there is no question that I-Aqua USA may be liable for direct infringement.  However, Defendants contest LWT and Heinen's potential liability.  Based on the evidence presented at the preliminary injunction hearing, I agree that Plaintiffs have not sufficiently shown that Heinen or LWT are potentially liable for infringement.

According to Defendants, LWT has not used, bought, sold, offered for sale, or imported the SeaDart Ace watercraft.  (DE 110 at 186).  LWT primarily rented or chartered Plaintiffs' product, the SEABOB.  (DE 109 at 32-33).  Gruner testified that he saw SeaDart Ace watercraft on Fort Lauderdale beach on two occasions in July 2021.  However, Plaintiffs have not shown that the SeaDart Ace watercraft Gruner saw on Fort Lauderdale beach belonged to LWT.  In fact, the location where Gruner found the SeaDart Ace on Fort Lauderdale beach is listed as the address of LWR, Heinen's other company which is not a party to this lawsuit.  (DE 110 at 115).  Thus, I find that Plaintiffs' have not shown that their allegations of infringement (direct, induced, or contributory) against LWT are likely to succeed.

As for Heinen, I find that the corporate veil will likely shield him from liability for direct infringement.  *See Wordtech Sys.*, 609 F.3d at 1313.  Plaintiffs have not alleged, nor sufficiently proven, any facts to show that this Court should disregard the corporate form (or pierce the corporate veil) and find Heinen directly liable for any of I-Aqua USA's alleged acts of infringement under an alter ego theory.

Notably, the corporate form does not shield corporate officers such as Heinen from liability under theories of induced infringement or contributory infringement.  *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1578–79 (Fed. Cir. 1986) ("[I]t is well settled that corporate officers who actively aid and abet their corporation's infringement may be personally

liable for inducing infringement under § 271(b) regardless of whether the corporation is the alter ego of the corporate officer.").  However, I find that Plaintiffs have not sufficiently shown that either of these third-party theories of liability are likely to succeed as to Heinen.  "[I]nducment requires that the alleged infringer *knowingly* induced infringement and possessed specific intent to encourage another's infringement." *Wordtech Sys.*, 609 F.3d at 1315 (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc); *see also Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009) ("Inducement requires a showing that the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent.").  Mere knowledge that the acts alleged constitute infringement is not enough to hold a corporate officer personally liable for inducing infringement.  *See California Expanded Metal Prods. Co. v. Klein*, 426 F. Supp. 3d 730, 754 (W.D. Wash. 2019) (citing *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990)).  As such, for Heinen to be personally liable for inducement, Plaintiffs must show that his "actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Manville Sales Corp.*, 917 F.2d at 553.  They failed to do so.

It is unclear whether Heinen knew whether the old version or the current version of the SeaDart Ace watercraft infringed Plaintiffs' patents.  Heinen testified that he became aware of the previous lawsuit regarding I-Aqua HK's products at the end of 2020 and the beginning of 2021 (before the Initial Complaint in this case was filed).   However, Heinen was not involved in the manufacturing process, and I-Aqua HK told him that the SeaDart Ace watercraft did not infringe Plaintiffs' patents.  *Cf. Klein*, 426 F. Supp. 3d at 755 (finding personal liability for third party infringement where individual defendant was the inventor of the patents and was already involved in two lawsuits regarding the patents).  Although the facts show that Heinen may have had some

knowledge of "an infringement controversy" surrounding the SeaDart Ace watercraft, Plaintiffs have not shown the knowledge and specific intent required for a finding of inducement under section 271(b). *See Symbol Techs., Inc. v. Metrologic Instruments, Inc.*, 771 F. Supp. 1390, 1404 (D.N.J. 1991) ("Generally, knowledge has been construed as knowledge of an infringement controversy."). Plaintiffs have also wholly failed to show that section 271(c) is applicable.

### 2.  Claim Construction

An infringement analysis begins with claim construction. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326 (Fed. Cir. 2006); *Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998). The two claims at issue are claim 19 of the '814 Patent and claim 1 of the '019 Patent. Claim 19 of the '814 Patent reads as follows:

> A motor-driven watercraft, having a body on which a user at least partially rests or stands and having a flow channel extending through the body for containing a screw driven by an electric motor, wherein the electric motor, batteries, a control device for the electric motor and the screw are at least partially housed in the flow channel, the motor-driven watercraft comprising:
>
> > the electric motor having an internal rotor,
> >
> > a stator in heat-conducting contact with a receiver housing of the electric motor by a heat-conducting unit,
> >
> > in an area adjacent the heat-conducting unit the receiver housing formed at least partially of a material capable of conducting heat, and
> >
> > the receiver housing arranged at least partially in the flow channel.

'814 Patent col. 7, lines 19-34. Claim 1 of the '019 Patent reads:

> A rechargeable battery unit for a watercraft, the rechargeable battery unit comprising:
>
> > a holding arrangement including two holders, each holder having a plurality of receptacles; a plurality of rechargeable batteries connected to one another by the holding arrangement to form a rechargeable battery cell, each of the rechargeable batteries having two poles;

at least one pole connector electrically coupling at least some of the rechargeable batteries to one another;

wherein two or more rechargeable battery cells are lined up with one another and electrically coupled to one another; and

wherein the two holders of the holding arrangement of each rechargeable battery cell are separated by a clearance distance, each holder receiving a respective one of the two poles of each rechargeable battery.

'019 Patent col. 6, lines 55-67; col. 7, lines 1-4.

On April 29, 2022, I issued a report and recommendation construing the following six terms in the asserted claims:

"Flow channel": "an internal passageway through which water may flow"

"Heat conducting unit": "a component that connects the stator to the housing and which is able to conduct heat"

"Material capable of conducting heat": "a material capable of conducting heat"

"Holder": "an object that as a plurality of receptacles"

"Receptacle": "a component into which another object is inserted"

"Holding arrangement: "a configuration of two spaced-apart holders"

(DE 172).   The District Court entered an order affirming and adopting the report and recommendation on May 20, 2022.  (DE 189).

### 3.  Infringement of the '814 Patent

I find that Plaintiffs have not demonstrated that they will likely succeed in proving infringement of claim 19 of the '814 Patent.  Plaintiffs allege they are the owners of the '814 Patent, which is a duly issued patent.  In opposition to the Motion, Defendants do not contest the

validity of the '814 Patent.[2]  Therefore, Plaintiffs will likely meet the first element of their patent infringement claim.  *See BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1399 (Fed. Cir. 2022) ("Absent an invalidity defense, 'the very existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue.'" (quoting *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009)). However, Plaintiffs have not sufficiently proven the second element – whether the accused device infringes their patents.

Defendants lodge three primary contentions of non-infringement.  First, they argue that the control device in the SeaDart Ace is not in the watercraft's "flow channel."  Second, they argue that the SeaDart Ace's "heat conducting unit" must be separate and apart from its stator and its housing.  Third, and finally, they argue that the stator is not in "heat-conducting contact" with the receiver housing because there is insulating material between the two components.  I will address each of these arguments in turn.

Defendants' "flow channel" argument fails.  Defendants' argument that the control device is not within the flow channel appears to be based on their belief that the "flow channel" is confined to the bottom of the watercraft and does not extend to the front of the watercraft.  They argue that the SeaDart Ace's control device, which is towards the front of the watercraft, is above and in front of the watercraft's flow channel.  However, this argument depends on Defendants' strained construction of the term "flow channel."  Nothing in the patent or the Court's construction thereof suggests that the flow channel must be in a particular area of the watercraft.  Just as Wizenti

---

[2] In Defendants' counterclaims they alleged that the '814 Patent was invalid under 35 U.S.C. §§103, 112.  (DE 44 at 25).  However, they did not press these invalidity arguments in their response to the Motion for Preliminary injunction, which was filed a month later.  (DE 63). Therefore, I recommend that the Court decline to address Defendants' contentions of invalidity.

testified, the patent even contemplates that the flow channel could consist of the entire body of the watercraft. *See* '814 Patent col. 3, lines 20-22 ("The construction can be further simplified if the flow channel is formed in one piece out of the body of the craft."); col. 4, lines 27-29 ("The flow channel can be formed in one piece in the body 10 of the craft. In one embodiment, the flow channel 8 is formed from an upper shell 10.1 and a lower shell 10.2."). As such, the SeaDart Ace's control device is clearly in the watercraft's flow channel. Even under Defendants' strained construction of the term, a view of the underside of the watercraft reveals that the control panel is housed "at least partially" in the flow channel. (DE 66-7 at 2; DE 66 at 7). Accordingly, I find that Plaintiffs have shown this contention of non-infringement lacks merit.

Similarly, Defendants' "heat-conducting unit" argument fails. Defendants' argument regarding this term stems from their interpretation of the following language in the claim: "a stator in heat-conducting contact with a receiver housing of the electric motor by a heat-conducting unit." '814 Patent col 7., lines 27-28. According to Defendants, this language requires that the heat-conducting unit, the stator, and the receiver housing be three distinct components within the motor. *See* (DE 82 at 13; DE 128 at 10) (stating that a heat conducting unit should be construed as "a component distinct from and separate from a stator and a housing but cast with the stator and the housing"). But the Court has rejected Defendants' proposed construction. I previously found no support for Defendants' argument that the heat-conducting unit had to be "cast" with (rather than simply connected to) the stator or the housing or that the heat-conducting unit had to be separate from the stator or the housing. (DE 172 at 8). Rather, the Court's construction indicates that the heat-conducting unit simply "connects the stator to the housing." (DE 172 at 8; DE 189 at 1). Under that construction, Defendants' argument fails.

However, I find that Defendants' third contention of non-infringement, that the stator in the SeaDart Ace is not in "heat conducting contact" with the receiver housing, raises a substantial question that Plaintiffs have failed to rebut, at least at this stage.  Recall, claim 19 of the '814 Patent requires the stator to be "in *heat conducting contact* with a receiver housing."  *See* '814 Patent col. 7, lines 27-28 (emphasis added).  At the preliminary injunction hearing, Wizenti testified that the SeaDart Ace's heat conducting unit, which he claimed was made of sheet metal, was in direct contact with the receiver housing.  Mohammed, who works for I-Aqua HK (the manufacturer of the SeaDart Ace), later testified that I-Aqua HK uses epoxy to help bond the stator to the housing and keep the stator in place.  According to Mohammed, the epoxy used in the SeaDart Ace does not conduct heat but rather insulates, which is the opposite of heat conduction.

The testimony presents two factual questions which control the result of the ruling.  The first is whether there is, in fact, epoxy between the SeaDart Ace's stator and housing.  The second concerns the effect of the epoxy, assuming it is there.  On the first question, Mohammed testified that I-Aqua HK uses epoxy, injected into an air gap between the stator and the housing, to bond the stator to the housing.  From a naked-eye examination of the SeaDart Ace stator entered into evidence (DE 114-20), it is difficult to discern whether an air gap and epoxy is present.  While there is an apparent seam between the stator and the motor, the presence (or absence) of epoxy is not obvious.  Plaintiffs presented a video of a CT scan of the SeaDart Ace's motor to demonstrate that no epoxy is visible and to cast doubt on Mohammed's testimony.  After viewing the video, Mohammed agreed with Plaintiffs that he could not see epoxy between the stator and the housing, but he testified this was because the CT scan did not detect the epoxy (seemingly contradicting his earlier supposition that one should be able to see epoxy on an "x-ray" (DE 110 at 202).  Mohammed  testified that the CT scan only detected the metal of the receiver housing and the

copper winding.   Plaintiffs did not present any rebuttal testimony, including any explanation for why the epoxy should have been visible on the CT scan or how the stator would otherwise be fixed to the housing.   Based on the evidence presented, whether the air gap and epoxy is present or not is a close question.   However, I conclude that Mohammed's testimony was not sufficiently controverted to reject and accept his assertion that there is epoxy between the stator and the housing.

On the second question, Plaintiffs argue that even if there is epoxy between the stator and the housing, the SeaDart Ace's motor still infringes their patents.  (DE 111 at 40).  According to Plaintiffs, the presence of epoxy does not prevent the stator from being in heat-conducting contact with the housing.  *Id.* at 41-42.  However, as stated above, Mohammed testified that I-Aqua HK uses an insulating epoxy.  Defendants admitted that heat may dissipate out through the housing but asserted that the insulating epoxy prevents heat conducting contact, which is required under the claim at issue.  *Id.* at 52.  Plaintiffs' evidence did not sufficiently explain whether the contact between the stator and the receiver housing could still be "heat conducting" if insulating epoxy was placed between the two components.   Plaintiffs also did not present any evidence demonstrating that the epoxy was not, in fact, insulating.  Therefore, I find that Defendants have raised a substantial question and I cannot find, based on the evidence presented thus far, that Plaintiffs have clearly demonstrated that they are "more likely than not" to succeed on their claim of infringement. *See Viskase Cos. v. World PAC Intern.*, 731 F. Supp. 2d 764, 771 (N.D. Ill. 2010).

### 4.  Infringement of the '019 Patent

While I find that Plaintiffs have demonstrated that the old version of the SeaDart Ace's battery infringes claim 1 of the '019 Patent, I find that Plaintiffs have not demonstrated they are likely to succeed in proving that the *current* version of the SeaDart Ace's battery so infringes.

Plaintiffs sufficiently allege that they are the owners of the '019 Patent, which is a duly-issued patent.  In opposition to the Motion, Defendants do not contest the validity of the '019 Patent.[3] Therefore, Plaintiffs have met the first element of its claim regarding this patent.  *See BlephEx, LLC*, 24 F.4th at 1399.  However, Plaintiffs again fail on the second element of this infringement claim (at least regarding the current battery in the SeaDart Ace).

Defendants effectively concede that the old version of the SeaDart Ace battery, found in watercraft manufactured in 2020, infringes the '019 Patent, and I find that the old battery in the SeaDart Ace watercraft likely infringes claim 1 of the '019 Patent.  The old battery contains every element of the claims, and Defendants do not allege any bases of noninfringement or invalidity. *See Mas-Hamilton Grp.*, 156 F.3d at 1211.  Mohammed, who works for the manufacturer, I-Aqua HK, even admitted that the old battery infringes the '019 Patent.  As for the new version of the battery, Defendants argue that it does not infringe the asserted claim because the holders: (1) do not have a plurality of receptacles, (2) are separated by a clearance distance, and (3) do not receive a respective end of one of the poles.

I agree with Defendants' argument regarding the new battery.  The holders of the new battery unit are not "separated by a clearance distance" as stated in the asserted claim and the unit's "holding arrangement" is not configured of two "spaced-apart holders" as required by the Court's claim construction.  The alleged infringing device's clear failure to meet this element of the claim obviates the need to discuss any of the other bases of non-infringement alleged by Defendants. *See id.*

---

[3] In Defendants' counterclaims they alleged that the '019 Patent was invalid under 35 U.S.C. §103. (DE 44 at 24).  However, they did not mention this invalidity argument in their response to the instant Motion, which was filed a month later.  (DE 63).  Therefore, as stated in footnote 3, I recommend that the Court decline to address Defendants' contention of invalidity.

Plaintiffs question Mohammed's testimony that the battery in the SeaDart Ace has actually changed, implying that SeaDart Aces still use the "old" battery design. But Plaintiffs have neither sufficiently undermined his credibility on this point nor have they presented evidence to demonstrate that the old battery is in the SeaDart Ace watercraft currently being imported by I-Aqua USA. While neither party took the opportunity to open the current version of the SeaDart Ace that was entered into evidence to show the battery design within it, it is Plaintiffs burden to demonstrate their likelihood of success. *See Trebro Mfg., Inc.*, 748 F.3d at 1166. Thus, without more conclusive evidence refuting Mohammed's testimony, I cannot conclude that Plaintiffs have satisfied their burden.

As for the old battery, although it is likely infringing, Plaintiffs have failed to show that any of the Defendants should be liable for that infringement. The only evidence before the Court is that the devices I-Aqua USA has sold or seeks to import and sell have the new battery design. The only SeaDart Ace that could subject any of the Defendants to liability regarding the '019 Patent is the SeaDart Ace Heinen received from Fultz, which contained the old battery. However, Plaintiffs failed to show how I-Aqua USA, which was not formed at the time Heinen obtained the device, and LWT were connected to this SeaDart Ace. While Heinen's connection to the device is known (as he stated that he and his LWR staff tested the device), Plaintiffs have not shown whether his testing of the device constitutes a "use" under the statue (35 U.S.C. § 271) and whether he can be held personally liable for that use without piercing the corporate veil of LWR. *See Van Well Nursery, Inc.*, 362 F. Supp. 2d at 1228 (stating that "[t]he inquiry as to what constitutes 'use' of a patented item is highly case-specific"). Ultimately, I find that Plaintiffs have not proven they are likely to succeed against the Defendants in this case on their claims of infringement regarding the '019 Patent.

**ii.  Breach of Dealer Agreement**

Plaintiffs' breach of contract claim is governed by the law of the Eleventh Circuit.  *See LEGO A/S v. ZURU Inc.*, 799 Fed. Appx. 823, 826–27 (Fed. Cir. 2020) ("When reviewing the grant of a preliminary injunction as to . . . legal issues over which [the Federal Circuit] does not have exclusive subject matter jurisdiction, this Court applies the law of the regional circuit."); *see also National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1188 n. 2, 37 USPQ2d 1685, 1686 n. 2 (Fed. Cir. 1996) (same).

"A breach of contract claim under Florida law requires the existence of a contract, the breach of the contract, and damages resulting from the breach."[4]  *Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1217 (11th Cir. 2018) (citing *DNA Sports Performance Lab, Inc. v. Club Atlantis Condo. Ass'n*, 219 So. 3d 107, 109 (Fla. 3d DCA 2017)). Claims regarding the breach of a restrictive covenant are governed by section 542.335, Florida Statues, "which contains a comprehensive framework for analyzing, evaluating and enforcing" those contracts.  *See Transunion Risk & Alt. Data Sols., Inc. v. Challa*, 9:15-CV-81049, 2016 WL 1161219, at *4 (S.D. Fla. Mar. 23, 2016) (quoting *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230–31 (11th Cir. 2009)).  The party seeking to enforce a restrictive covenant *must* show the following: (1) the contract is reasonable in time, area, and line of business; (2) the covenant is set forth in a writing signed by the party at issue; (3) there are one or more legitimate business interests to justify the covenant; and (4) that the covenant (and the restraint specified therein) is reasonably necessary to protect those legitimate business interests.  *See* § 542.335(1).  "Legitimate business interests" include (1) trade secrets, (2) confidential business information that is not

---

[4] Section 13.7 of the Dealer Agreement indicates that claims related to the Agreement will be governed by Florida law.  (DE 49-1 at 10).

otherwise protectable as a trade secret, (3) substantial relationships with prospective or existing clients, (4) client goodwill, and (5) extraordinary or specialized training. *See* § 542.335(1)(b).

I find that Plaintiffs have not shown they are substantially likely to succeed on their breach of contract claim. The contract at issue is Plaintiffs' Dealer Agreement with LWT. Plaintiffs seek to enforce two restrictive covenants within this Dealer Agreement: the confidentiality clause and the competition clause.[5] *See Rauch, Weaver, Norfleet, Kurtz & Co., Inc. v. AJP Pine Island Warehouses, Inc.*, 313 So. 3d 625, 630 (Fla. 4th DCA 2021) (stating that noncompetition and confidentiality provisions are restrictive covenants). Regarding the confidentiality clause, Plaintiffs have failed to establish that there has been a breach of this provision. Plaintiffs alleged that Heinen and LWT had access to some of its confidential information (*e.g.*, DE 110 at 111-13), but there is no concrete evidence that they took or utilized this information. *See Imagine Commc'ns Corp. v. Villegas*, 17-CV-20401, 2017 WL 10398556, at *11 (S.D. Fla. Nov. 29, 2017) (finding no evidence that defendants disclosed plaintiff's confidential information); *ZUP, LLC v. Nash Mfg., Inc.*, 229 F. Supp. 3d 430, 456 (E.D. Va. 2017), *aff'd*, 896 F.3d 1365 (Fed. Cir. 2018) (denying claims of breach of confidentiality agreement and trade secret misappropriation in a patent infringement case where the plaintiff proffered no evidence that defendant took its confidential information).

Plaintiffs have also failed to establish that either LWT or Heinen breached the competition provision. Plaintiffs have not pointed to any actions taken by LWT that constitute a breach of this

---

[5] At the hearing, Plaintiffs also suggested that Defendants breached the Dealer Agreement's no-conflict clause. (DE 109 at 195). This argument was not advanced by Plaintiffs in either their instant Motion or the Second Amended Complaint. Regardless, this argument does not support injunctive relief. As stated below, Plaintiffs admit that the Dealer Agreement is no longer in effect. (DE 110 at 113-14; DE 111 at 43). By virtue of this admission, even if Plaintiffs can demonstrate a breach of the no-conflict clause, Plaintiffs cannot demonstrate a likelihood of future irreparable harm from that breach.

provision.  As for Heinen, Plaintiffs have presented evidence that he competed with them via his work for either I-Aqua USA or LWR and essentially argue that the lines between the different entities (and Heinen himself) are so blurry that they should be ignored.  However, Plaintiffs have not sufficiently articulated how the Dealer Agreement binds Heinen individually nor have they pled a veil piercing theory to hold him personally liable for the conduct of any of the abovementioned corporate entities.  More importantly, Plaintiffs have not yet pled or proven any of the elements under section 542.335(1), which are necessary to support a finding in their favor.

Therefore, I cannot find that Plaintiffs are likely to succeed on these claims.

### b.  Irreparable Harm

"[T]o satisfy the irreparable harm factor in a patent infringement suit, a patentee must establish both of the following requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012).  "[T]he causal nexus requirement is simply a way of distinguishing between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition." *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1361 (Fed. Cir. 2013).

Plaintiffs argue that they will be irreparably harmed due to the direct competition in the market and evidence of their unwillingness to license their patented technology.  Plaintiffs further argue that the market for luxury water scooters in the United States is young and, if I-Aqua USA is allowed to continue selling the SeaDart Ace, their brand will lose its value, they will lose sales and market share, and the price of their products will be permanently eroded.  Had Plaintiffs sufficiently demonstrated that the *current* version of the SeaDart Ace infringes either of their patents, I would agree that there is a likelihood of irreparable future harm as to the patent

infringement claims.[6]  *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (stating that "loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm").  However, in light of the above recommendation that Plaintiffs have not sufficiently shown that their claims of infringement are likely to succeed, I cannot find that there is a likelihood of irreparable harm.

Similarly, because Plaintiffs have not shown that their claims based on the Dealer Agreement are likely to succeed, I cannot find that there is a likelihood of irreparable harm.  Even if Plaintiffs had shown they were likely to succeed on their claims regarding the Dealer Agreement, they have not shown any potential for future or ongoing harm. Plaintiffs have admitted that the Dealer Agreement terminated in December 2021 and is no longer in effect.  (DE 110 at 113-14; DE 111 at 43).  Thus, the Dealer Agreement's non-compete provision cannot support a finding of future irreparable harm.  Further, because there is no evidence of Heinen or LWT taking or utilizing Plaintiffs' confidential information, much less evidence that they will continue to do so in the future in a way that will significantly damage Plaintiffs, the confidentiality clause cannot support such a finding either.

### c.  Balance of Harms and Public Interest

Under the third factor of the preliminary injunction test, "[t]he district court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted."  *Hybritech Inc. v. Abbott*

---

[6] To the extent that Plaintiffs have shown that SeaDart Ace watercraft containing the old battery design infringe their patents, I find that they have not shown a likelihood of future irreparable harm because the only evidence before the Court is I-Aqua HK's representation that it is no longer producing or selling SeaDart Ace watercraft with the old battery design in the United States.  *See Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 367 Fed. Appx. 148, 149 (Fed. Cir. 2010) (reversing a district court's decision to enjoin a defendant when there was conflicting evidence about the possibility of future infringement).

*Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988).   Under the fourth and final factor, the court must consider the effect of an injunction on the public interest.   *See Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d at 1371.   However, a trial court does not need to make findings concerning these factors "if the moving party fails to establish either of the first two factors."   *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973–74 (Fed. Cir. 1996); *Ethicon Endo-Surgery, Inc. v. Covidien LP*, CV 16-12556-LTS, 2017 WL 4392877, at *7 (D. Mass. Oct. 2, 2017); *Kone Corp. v. ThyssenKrupp USA, Inc.*, CV 11-465-LPS-CJB, 2011 WL 13137061, at *21 (D. Del. Dec. 2, 2011).   In light of Plaintiffs' failure to prove either of the first two factors, I recommend that the Court deny their motion for preliminary injunction and decline to express an opinion on the third and fourth factors of the preliminary injunction test.   *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (stating that the Federal Circuit's "case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors").

## CONCLUSION

In conclusion, after consideration of the above factors, I recommend that Plaintiffs' Motion (DE 45) be **DENIED**.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge.   Failure to timely file objections shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.   *See* 28

U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida, this 27th day of May 2022.

Jared M. Strauss
United States Magistrate Judge